IN THE DISTRICT COURT OF THE VIRGIN ISLANDS
DIVISION OF ST. CROIX

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| | ) CRIM. NO.: 10-cr-51 |
| v. | ) |
| | ) |
| LEO JACKSON | ) |
| | ) |
| Defendant. | ) |
| | ) |

**MEMORANDUM OPINION**

Finch, Senior Judge

THIS MATTER is before the Court on the motion of defendant Leo Jackson ("Jackson") to suppress evidence of marijuana plants seized at his residence. The Government opposes the motion on the ground that the evidence seized was in plain sight, and in the alternative, that the inevitable discovery doctrine renders the evidence admissible. A hearing was held on the motion on March 15, 2011.

**I.   Facts**

On October 14, 2010 at sometime between 6:00 and 7:00 a.m., Virgin Islands police officers Gregory Bennerson, Sean Santos and Jason Viveros executed an arrest warrant for Leo Jackson at his residence at plot #280 Estate Work and Rest. The arrest warrant had been issued by a magistrate at the Virgin Islands Superior Court in relation to a robbery occurring in July of 2010. Officer Bennerson knocked on the front door and identified himself as a police officer. While standing at the entrance to Jackson's front door, Bennerson observed a black flower pot containing a marijuana plant. Jackson came to the door right after Bennerson made this

observation. The officers informed Jackson that he was under arrest and told him to get dressed. While Jackson was inside dressing, Bennerson inspected the premises for weapons. When Jackson came out, he was placed in handcuffs, at which point Bennerson asked him what was in the black flower pot. Jackson stated that it was a marijuana plant but when Bennerson asked if there were other plants on the premises, Jackson stated that there were not. Bennerson testified that he turned his head to the left, looking south, and observed a green leafy plant on top of a hill, which he believed to be marijuana based on the height of the plant and its buds.[1] Bennerson estimated that the distance from where he stood and where the plant was located was between 15 to 20 feet. Bennerson then went to investigate further and discovered additional plants on top of the hill. He placed a call to forensics to come and collect the plants and remained on the scene while Santos and Viveros transported Jackson to the police station.

Testimony at the suppression hearing as well as photographs established the location of various structures on Jackson's property and the location of the marijuana plants in relation to those structures. Jackson's residence was located at the foot of a hill and his front door faced south in the direction of the hill. Looking south and up the hill from Jackson's door there was a white trailer parked on what appears to be a cement driveway. The hitch of the trailer is located at the easternmost portion of the cement. The area to the east of the trailer was unmaintained and bushy. Beyond the trailer and slightly to the west, there was an orange building that was variously described as a shed or an abandoned house. Behind the trailer, there were wooden structures, each resting on a blue pallet. These structures were described as dog houses. Photos indicate that from Jackson's front door, the view of the dog houses is completely obstructed by

---

[1] The photo of the marijuana plant in government's exhibit B is alleged to be a photo of the plant that Bennerson observed. However he did not testify that the image captured in Ex. B represents the way he viewed the plant from Jackson's front door.

the trailer. (Def. Exs. B and E.)[2] The marijuana plants were located to the south of that trailer, further up the hill. Some were located directly behind the dog houses, others slightly to the east of the doghouse or behind the bushes to the east of the trailer. A photograph of the marijuana plant observed by Bennerson from Jackson's front door indicates that it was adjacent to one of the dog houses. (Govt. Ex. B.)[3] Eric Freeman, an investigator hired by defendant, testified that he measured the distance from the front door of Jackson's residence to the dog houses and determined that it was approximately 84 feet.

## II. Discussion

### A. Jackson's Expectation of Privacy

"As a general rule, the burden of proof is on the defendant who seeks to suppress evidence." *United States v. Johnson*, 63 F.3d 242, 245 (3d Cir. 1995) (citing *United States v. Acosta*, 965 F.2d 1248, 1256 n. 9 (3d Cir.1992)). "However, once the defendant has established a basis for his motion, i.e., the search or seizure was conducted without a warrant, the burden shifts to the government to show that the search or seizure was reasonable." *Id*. (citing *United States v. McKneely*, 6 F.3d 1447, 1453 (10th Cir.1993)).

In this case, the police had a warrant to arrest Jackson, but not to search his house or the property surrounding his residence. It is a "basic principle of Fourth Amendment law that searches and seizures inside a home without a warrant are presumptively unreasonable." *Brigham City, Utah v. Stuart*, 547 U.S. 398, 403 (2006) (internal quotation and citation omitted). The right to privacy in the home extends to its curtilage. *United States v. Dunn,* 480 U.S. 294,

---

[2] The visual evidence presented at the hearing was supported by the testimony of defense witnesses, Eric Freeman and Kye Walker, who both indicated that from Jackson's front door, the dog houses could not be seen because they were behind the trailer.

[3] Bennerson testified that the photograph in the government's exhibit B was a photograph of the plant that he spotted from the south side of Jackson's residence.

300 (1987); *see also United States v. Taylor*, 458 F.3d 1201, 1206 (11th Cir.2006) (citing *Oliver v. United States*, 466 U.S. 170, 180 (1984) ("The private property immediately adjacent to a home is entitled to the same protection against unreasonable search and seizure as the home itself"). The curtilage has been defined "as the area around the home to which the activity of home life extends." *Id*. at 302. What constitutes the curtilage of a home is determined by reference to the following factors: "the proximity of the area claimed to be curtilage to the home, whether the area is included within an enclosure surrounding the home, the nature of the uses to which the area is put, and the steps taken by the resident to protect the area from observation by people passing by." *Id.* at 301. In this case, the plants were located on the same plot of land as Jackson's house, namely plot #280 Estate Work and Rest. Moreover, the plants were located in an area that was used to store personal property, including the trailer and the dog houses. There was also testimony that the property was enclosed by a fence. Based on these factors, the Court concludes that the marijuana plants were located on the curtilage of Jackson's property and thus, he had an expectation of privacy in that area. Consequently, it was presumptively unreasonable for any warrantless search to be conducted on that property.

### B. The Plain View Exception

The government argues that there was no search because the marijuana plants were in plain view of Bennerson as he stood at the entrance to Jackson's residence. "It is well established that under certain circumstances the police may seize evidence in plain view without a warrant." *Arizona v. Hicks*, 480 U.S. 321, 326 (1987) (quoting *Coolidge v. New Hampshire*, 403 U.S. 443, 465 (1971)). In delineating the scope of the plain view doctrine, courts have described its relationship to the rights protected by the Fourth Amendment. As the Supreme Court has explained, "[t]he right to security in person and property protected by the Fourth Amendment

may be invaded in quite different ways by searches and seizures. A search compromises the individual interest in privacy; a seizure deprives the individual of dominion over his or her person or property." *Horton v. California*, 496 U.S. 128, 133 (1990) (citing *United States v. Jacobsen*, 466 U.S. 109, 113 (1984)). "If an article is already in plain view, neither its observation nor its seizure would involve any invasion of privacy." *Id.* On the other hand, "[a] seizure of the article . . . would obviously invade the owner's possessory interest." *Id.* at 143 (citing *Maryland v. Macon*, 472 U.S. 463, 469 (1985)). In order to protect the privacy and the possessory interests secured by the Fourth Amendment, courts have developed the following standard to determine when a seizure under the plain view doctrine is lawful: (1) the officer has not violated the Fourth Amendment in "arriving at the place from which the evidence could be plainly viewed"; (2) the incriminating character of the evidence is "immediately apparent"; and (3) the officer has "a lawful right of access to the object itself." *United States v. Stabile*, ---F.3d---, 2011 WL 294036, at *16 (3d Cir. Feb. 1, 2011) (quoting *United States v. Menon*, 24 F.3d 550, 559-60 (3d Cir.1994)).

The Supreme Court has given an indication of the scenarios that could support a seizure under the plain view doctrine:

> An example of the applicability of the 'plain view' doctrine is the situation in which the police have a warrant to search a given area for specified objects, and in the course of the search come across some other article of incriminating character. Where the initial intrusion that brings the police within plain view of such an article is supported, not by a warrant, but by one of the recognized exceptions to the warrant requirement, the seizure is also legitimate. Thus the police may inadvertently come across evidence while in 'hot pursuit' of a fleeing suspect. And an object that comes into view during a search incident to arrest that is appropriately limited in scope under existing law may be seized without a warrant. Finally, the 'plain view' doctrine has been applied where a police officer is not searching for evidence against the accused, but nonetheless inadvertently comes across an incriminating object.

*Horton*, 496 U.S. at 135 (citations and internal quotations omitted).

There is no dispute here that when Bennerson viewed the marijuana plant that was located near Jackson's front door, he was lawfully present pursuant to the arrest warrant. *Payton v. New York,* 445 U.S. 573, 603 (1980) ("an arrest warrant founded on probable cause implicitly carries with it the limited authority to enter a dwelling in which the suspect lives when there is reason to believe the suspect is within"). Moreover, it is also apparent that Bennerson, who testified to his law enforcement experience with regard to marijuana, immediately recognized the incriminating nature of that plant. *United States v. Benish*, 5 F.3d 20, 25 (3d Cir. 1993). Thus, because Bennerson was lawfully present and the plant was immediately recognized as contraband, Bennerson had a lawful right of access to seize that plant. *United States v. Thomas*, 2009 WL 424589, at *7 (D.V.I. Feb. 19, 2009).

It is also true that in executing the arrest warrant on Jackson, Bennerson was entitled to conduct "a search of the arrestee's person and the area 'within his immediate control'" in order to prevent access to a weapon or the opportunity destroy evidence. *Chimel v. California*, 395 U.S. 752, 763 (1969). To broaden the search incident to arrest into a "protective sweep" of the property, "there must be articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene." *Maryland v. Buie*, 494 U.S. 325, 327 (1990). A protective sweep "is narrowly confined to a cursory visual inspection of those places in which a person might be hiding." *Id*. Here, there is no question that the plants on the hill—approximately 80 feet from Jackson's front door—were out of the reach of the hand-cuffed Jackson as he stood before his house in the custody of the police. Thus, a search incident to Jackson's arrest would not have justified a search up the hill and beyond the trailer. *Horton*, 496 U.S. at 140 (in the case of a search incident to a lawful arrest, "[i]f the police stray outside

the scope of such a search they are already in violation of the Fourth Amendment, and evidence so seized will be excluded"); *c.f. Chimel*, 395 U.S. at 763 (police require a warrant to search "any room other than that in which an arrest occurs" or to search "concealed areas in that room itself"). Additionally, Bennerson did not indicate a basis for believing that there were dangerous individuals at large in Jackson's yard such that he would have been justified in exploring the area beyond the trailer. Neither would the discovery of the marijuana plant near the front door have authorized Bennerson to perambulate around Jackson's property in search of additional plants. *See Menon*, 24 F.3d at 560 (the "plain view" doctrine cannot be used to expand the scope of a legal search); *Coolidge,* 403 U.S. at 466-467 (1971) ("the 'plain view' doctrine may not be used to extend a general exploratory search from one object to another until something incriminating at last emerges"); *c.f. Michigan v. Clifford*, 464 U.S. 287, 294 (1984) (evidence of criminal activity seized during an administrative search under the plain view doctrine cannot be relied upon to expand the scope of the search without first obtaining a search warrant).

In the end, the legality of Bennerson's alleged plain view seizure of the marijuana plants hinges upon his claim that he saw a marijuana plant while lawfully standing at Jackson's front door. After hearing the testimony and viewing the photographs of the structures on the property and the location of the plants, the Court is not persuaded that he did.

As noted previously, Bennerson identified the plant in the government's exhibit B as the one that he saw from Jackson's front door. That plant was adjacent to a dog house. (Gov't Ex. B. and Ex. C; Def. Ex. A.) The photographs show that there were two dog houses in the area between the trailer and the orange house on top of the hill, both located to the south of Jackson's residence. (Gov't Ex. C; Def. Ex. B and G.) The plant that Bennerson saw was located to the east of the dog house that was directly behind the trailer, such that neither the dog house, nor any

object situated adjacent to it could be seen from Jackson's front door. (Def. Ex. B and Ex. E).[4] In short, the government has not proven by a preponderance of the evidence that Bennerson viewed the marijuana plant in the government's exhibit B from a location in which he was lawfully entitled to be. *Menon*, 24 F.3d at 559-60. Accordingly, the marijuana plants seized from the property, other than the one at Jackson's front door, are not admissible under the plain view doctrine.

### C. The Inevitable Discovery Doctrine

The Government also argues that the marijuana plants are admissible because, based on Bennerson's observations, the marijuana would have inevitably been discovered through a search warrant.

When the government obtains evidence by violating a defendant's constitutional right to be free from unreasonable searches and seizures under the Fourth Amendment, the evidence will generally be excluded from use at trial. *United States v. Pelullo*, 173 F.3d 131, 136 (3d Cir. 1999) (citations omitted). The exclusionary rule is designed to deter police from unlawful conduct by denying the government the benefit of its violations. *See Nix v. Williams*, 467 U.S. 431, 442-443 (1984) ("The core rationale consistently advanced . . . for extending the exclusionary rule to evidence . . . has been that this admittedly drastic and socially costly course is needed to deter police from violations of constitutional and statutory protections."). However, this concern "must be weighed against the costs to the administration of justice in permitting obviously guilty defendants to be acquitted." *United States v. Torres*, 926 F.2d 321, 323 (3d Cir.

---

[4] Exhibit E is a photo of the trailer as viewed from Jackson's front door. The government argued that because Exhibit E was not taken on the day of Jackson's arrest, it is not a reliable indication of the location of the trailer, as the trailer could have been moved. However, the Court notes that in Exhibit E, the hitch of the trailer is located at the eastern-most portion of the cement driveway as it is in photographs taken on the day of Jackson's arrest. (See Def. Exs. B, C and D.) Thus, Exhibit E is sufficiently accurate insofar as it shows the location of the trailer.

1991). Thus, the rule's application is restricted "to those areas where its remedial objectives are thought most efficaciously served." *Id*. (citing *United States v. Calandra*, 414 U.S. 338, 348 (1974)). To that end, courts have refrained by excluding evidence "where the causal link between the constitutional violation and later-revealed evidence is tenuous or, indeed, non-existent." *Pelullo*, 173 F.3d at 136.

One basis for admitting evidence obtained pursuant to an illegal search or seizure is known as the inevitable discovery doctrine. *Id.* (citing *Nix*, 467 U.S. at 441-44). Under this doctrine, the prosecution must establish "by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means." *United States v. Vasquez De Reyes*, 149 F.3d 192, 195 (3d Cir. 1998). "The rule so applied permits the court to balance the public interest in providing a jury with all relevant and probative evidence in a criminal proceeding against society's interest in deterring unlawful police conduct." *Id*. (citing *Nix*, 467 U.S. at 443). "The Government can meet its burden by establishing that "the police, following routine procedures, would inevitably have uncovered the evidence."" *Stabile*, 2011 WL 294036, at *19 (quoting *Vasquez De Reyes*, 149 F.3d at 195). "The inevitable discovery analysis focuses on "historical facts capable of ready verification, not speculation." *Id*. (citing *Vasquez De Reyes*, 149 F.3d at 195).

Here, the government put forth no evidence that it had engaged in a routine police procedure that would have inevitably led to the discovery of the marijuana plants behind the trailer. Instead, the Court is asked to speculate that Officer Bennerson could have obtained a search warrant to search the area surrounding Jackson's residence for additional plants. However, the Court cannot do so because "[p]roof of inevitable discovery involves no speculative elements but focuses on demonstrated historical facts capable of ready verification or impeachment . . . ."

*Vasquez De Reyes*, 149 F.3d 192 (quoting *United States v. Kennedy*, 61 F.3d 494, 498 (6th Cir.1995)).

In cases where the exception has been successfully applied, the government has met this burden of proof by showing that discovery of the evidence through lawful channels was imminent, s*ee, e.g., Nix*, 467 U.S. at 449 (defendant's statements concerning the location and existence of the victim's body was admissible even though defendant's right to counsel was violated because a search team was approaching the body and would have discovered it), or that police acting through routine procedures had taken steps to secure the evidence that would render exclusion without any deterrent effect. *See, e.g., Stabile*, 2011 WL 294036, at \*19-20 (evidence taken from hard drive admissible despite tainted search where police had probable cause to obtain a search warrant for the drive, undertook a routine police procedure by applying for and obtaining a warrant that incorrectly identified the hard drive to be searched);[5] *United States v. Parris*, 2007 WL 1371821, at \*3 (3d Cir. 2007) (evidence of gun under the bed was admissible under inevitable discovery doctrine where police found gun after entering house under exigent circumstances and subsequently obtained a warrant following discovery of gun). On the other hand, the Court of Appeals rejected application of the inevitable discovery doctrine where the government argued that it *would* have elicited evidence through a series of routine procedures. *Vaszquez de Reyes*, 149 F.3d at 195-96 (finding application of inevitable discovery inappropriate where court had to speculate as to a series of events in a hypothetical investigation that would have disclosed inculpatory information about marriage fraud).

---

[5] As the Third Circuit noted in this case, "the very fact that the Government attempted to secure state and federal search warrants at every step of the search indicates that there would be little deterrence benefit in punishing the Government." *Stabile*, 2011 WL 294036, at \*20.

The government cites the Fifth Circuit case *United States v. Jackson*, 596 F.3d 236 (5th Cir. 2010) in support of its position.[6]  However, the Court finds that the facts in this case are sufficient to distinguish it from the circumstances the Fifth Circuit confronted in *Jackson*.  In *Jackson*, the defendant had been indicted for participation in a drug conspiracy.  The officers, acting pursuant to both a state search warrant and federal arrest warrant, entered Jackson's property to execute the arrest. In conducting a sweep of the premises, officers looked below the couch, where they had seen Jackson place an item as they entered his house. Under the couch, the officers found a bag of marijuana. Pursuant to the search warrant, the officers continued to search the home and premises where they found evidence of methamphetamine production. The validity of the search warrant was later challenged by the defendant, who contended that the search was illegal and the evidence should be suppressed. The district court admitted the evidence primarily in reliance on the inevitable discovery doctrine and the defendant appealed. The Fifth Circuit held that that even without the authority of the search warrant, the police were authorized to make a protective sweep both inside and outside the home and that the marijuana under the couch and items in the yard could be seized pursuant to the plain view doctrine. Additionally, based on the inevitable discovery doctrine, the remaining evidence turned up in the search of the home was admissible because the evidence found in plain view provided police with probable cause to support a search warrant.

---

[6] The Court notes that Fifth Circuit applies a standard somewhat different from the standard employed in the Third Circuit. Under Fifth Circuit law, "the inevitable discovery rule applies if the Government demonstrates by a preponderance of the evidence that (1) there is a reasonable probability that the contested evidence would have been discovered by lawful means in the absence of police misconduct and (2) the Government was actively pursuing a substantial alternate line of investigation at the time of the constitutional violation." *Jackson*, 596 F.3d at 241 (citing *United States v. Lamas*, 930 F.2d 1099, 1102 (5th Cir.1991)).  Here, while the same "preponderance of the evidence" standard applies, the government must prove that "the information ultimately or inevitably would have been discovered by lawful means," a burden which is met by establishing "that the police, following routine procedures, would inevitably have uncovered the evidence."  Though the difference may be subtle, the Third Circuit standard, which omits "reasonable probability" appears to call for more certainty regarding the discovery.

The government apparently relies on *Jackson* for the proposition that whenever the police have probable cause to support a warrant, any evidence seized without getting one is admissible pursuant to the inevitable discovery doctrine.  However, the Third Circuit has never so held, but rather warned that "[i]Inevitable discovery is not an exception to be invoked casually, and if it is to be prevented from swallowing the Fourth Amendment and the exclusionary rule, courts must take care to hold the government to its burden of proof."  *Vasquez De Reyes*, 149 F.3d at 196 (quoting *United States v. Jones*, 72 F.3d 1324 (7th Cir.1995)).  Moreover, whether or not the Fifth Circuit in *Jackson* explicitly relied on the fact that the officers had secured a search warrant (and that the district court had found that the affidavit was not a "bare bones" affidavit, i.e., that it could support a good faith reliance on its validity by police), that fact would be crucial in the Third Circuit, where the routine procedure of getting a warrant has been sufficient to uphold an otherwise illegal search. *See Stabile*, 2011 WL 294036, at *19-20; *Parris*, 2007 WL 1371821, at *3.  Significantly, in the instant matter, the police only possessed an arrest warrant, not a search warrant, and there was no testimony that police took any steps to secure a search warrant. Thus, while the deterrent effect of excluding evidence in *Jackson* was negligible, inasmuch as the police searched pursuant to a warrant, in this case, there is no evidence that the police made any attempt to put facts before a neutral magistrate in order to lawfully search the premises.  Instead, the Court is asked to accept that (1) the viewing of one marijuana plant by the entrance to Jackson's door would provide probable cause to obtain a search warrant for the location outside Jackson's house where the plants were located; and (2) that the police could have, rather than would have, gone to a magistrate to obtain such a warrant.  The Court declines to engage in that level of speculation, recognizing that applying the inevitable discovery rule whenever a police officer asserts probable cause to believe that contraband is on a suspect's premises would

effectively eviscerate the requirement for a search warrant. That is exactly the kind of application of the rule that would "swallow[]the Fourth Amendment and the exclusionary rule." *Vasquez De Reyes*, 149 F.3d at 196.

### III.    Conclusion

For the reasons stated above, the Court finds that the marijuana plant seized in plain view at the entrance to Jackson's door is admissible, while the remaining marijuana plants seized from Jackson's property on October 14, 2010 are suppressed.[7]

**Enter**:

Dated: April 8, 2011

_____/s/_____
Raymond L. Finch
Senior U.S. District Judge

---

[7] The defendant also moved at the hearing to suppress statements he made to police when (1) questioned by Officer Bennerson as to the identity of the marijuana plant found near his front door; and (2) statements made to police en route to the police station. The Court did not hear evidence regarding those statements and thus declines to rule on that issue at this time. However, it is noted that at the hearing, the government conceded that the statement about the identity of the plant near Jackson's door occurred while Jackson was in custody but before he was mirandized.